**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 NOV 25  A 10: 37

CLERK'S OFFICE
AT GREENBELT

BY _____ NU _____ DEPUTY

UNITED STATES OF AMERICA

*ex rel.*

[UNDER SEAL]

        Plaintiffs,

   vs.

[UNDER SEAL]

        Defendants.

Civil Action No. GTH 02 19 CV 3375

**FILED UNDER SEAL**
PURSUANT TO 31 U.S.C. § 3730
(False Claims Act)

**DO NOT PUT ON PACER**
**DO NOT PLACE IN PRESS BOX**

**FILED UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES, | |
| | |
| *ex rel.* KRAH PLUNKERT | |
| 27983 Malden Court | |
| Salisbury, MD 21801 | |
| | |
| and | **Civil Action No.:** _____ |
| | |
| STATE OF MARYLAND | **FILED UNDER SEAL** |
| | PURSUANT TO 31 U.S.C. § 3730 |
| Plaintiffs, | (False Claims Act) |
| | |
| v. | **DO NOT PUT ON PACER** |
| | **DO NOT PLACE IN PRESS** |
| MARYLAND BROADBAND COOPERATIVE | **BOX** |
| 2129A Northwood Drive | |
| Salisbury, MD 21801 | |
| | |
|    Serve: *Registered Agent*: | |
|    C T CORPORATION SYSTEM | |
|    4701 Cox Rd Ste 285 | |
|    Glen Allen, VA 23060 | |
| | |
| and | |
| | |
| W. PATRICK MITCHELL | |
| 4890-2 Drawbridge Road | |
| Cambridge, Maryland 21613 | |
| | |
| and | |
| | |
| BEL AIR UNDERGROUND SERVICES, INC. | |
| 725 Pulaski Hwy | |
| Joppa, MD 21085 | |
| | |
|    Serve: *Registered Agent:* | |
|    Wayne Kacher, Jr. | |
|    302 Brunswick Drive | |
|    Bel Air, MD 21015 | |
| | |
| and | |

PRO COMM E.L.S. LLC
725 Pulaski Hwy
Joppa, Maryland 21085

   Serve: *Registered Agent*:
   Scott A. Cassell
   1660 Cape Horn Road
   Hampstead, Maryland 21074

and

WAYNE KACHER, JR.
302 Brunswick Drive
Bel Air, Maryland 21015

Defendants.

## QUI TAM COMPLAINT

1.      Plaintiff-Relator Krah Plunkert brings this qui tam action, by and through undersigned counsel, and files this Complaint on behalf of himself, the United States of America, and the state of Maryland, against Defendants Maryland Broadband Cooperative ("MdBC"), W. Patrick Mitchell, Bel Air Underground Services, Inc. ("Bel Air"), Pro Comm E.L.S. LLC f/k/a Engineering & Locating Services, LLC ("Pro Comm"), and Wayne Kacher, Jr., jointly and severally, for damages and civil penalties arising out of the Defendants' collective violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986), the Anti-Kickback Act, 41 U.S.C. § 51 *et seq.*, and the corresponding statute in the named state.

## INTRODUCTION

2.      This case seeks to recover damages and civil penalties on behalf of the United States of America and the State of Maryland arising from MdBC and Mr. Mitchell's collective efforts to submit false and fraudulent records, statements, and claims made and/or caused to be made in connection with the subsequent misuse of broadband infrastructure grant funds paid to MdBC. Mr. Mitchell also conspired with Mr. Kacher, Bel Air and Pro Comm to engage in bid-

rigging and to pay and receive kickbacks using funds associated with the grants, in order to conceal the fraud and facilitate the fraud within an inner circle.

3. Defendants violated the federal and state False Claims Acts by knowingly presenting false or fraudulent claims to the government, and underpaying an obligation to the government in order to obtain government funding under false pretenses. Specifically, Defendants engaged in various activities to commit fraud, including:

(a) Embezzling grant funds for unauthorized expenses and improperly charging personal expenses and business expenses against federal and state grant projects;

(b) Charging for incomplete projects and costs that they did not incur; and

(c) Engaging in bid-rigging with subcontractors, as well as paying and accepting kickbacks to conceal fraud.

4. As a result, Defendants received grant funds for use, to which they were not entitled, then fabricated invoice payments and pertinent documentation submitted for the grant and reimbursement payments, in order to cover up their tracks.

5. If the government had known the nature and extent of MdBC's and Mr. Mitchell's intention to conspire with other Defendants to perpetrate fraudulent schemes, no grant payments would have been made to MdBC.

## JURISDICTION AND VENUE

6. This is an action brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331. This case arises from the Defendants' wrongful conduct, incident to obtaining funds from the federal and state government.

7.     This Court has personal jurisdiction over the Defendants under 31 U.S.C. § 3730(a), which authorizes nationwide service of process and because the Defendants have at least minimum contacts with the United States.

8.     31 U.S.C. § 3732(a) provides: "Any action under section 3730 may be brought in any judicial district in which the Defendants or, in the case of multiple Defendants, any one Defendant, can be found, resides, transacts business, or in any proscribed by section 3927 occurred," (b) Venue is proper in the State of Maryland in that, among other things, Defendants regularly transact business within the State and its principal place of business is in Virginia.

9.     Relator has insider knowledge of the information contained herein and is an original source. The government would not have known about this fraud, its details and its breadth and scope, without the personal knowledge provided by the Relator. Relator is an original source of the allegations contained herein and has pre-disclosed his allegations to governmental officials.

## PARTIES AND ENTITIES

### *Relator Krah Plunkert*

10.     Krah Plunkert is a resident of Maryland. He was the Director of Administration at MdBC from January 2015 to June 2019. Relator managed and spearheaded major projects at MdBC, including: helping develop a software application to manage MdBC's entire operations system; overseeing the construction of a warehouse facility at corporate headquarters and fiber optic huts in Wye Mills and Western Maryland; and implementing OSHA training for employees. MdBC also tasked Mr. Plunkert with facility maintenance, fleet management, compliance with the Department of Transportation regulations, and human resources oversight.

11.     Relator was responsible for a broad range of projects and activities at MdBC. Therefore, he was privy to, and has independent knowledge of, the detailed operations of the business.

12.     Prior to his employment at MdBC, Relator worked for the Maryland State Police ("MSP") in various roles throughout his 27-year tenure and service. He retired as a Lieutenant in December 2015. As Lieutenant, Relator was responsible for managing the daily operations of both routine law enforcement operations and major projects involving management, allocation, scheduling, and on-site coordination of internal and external resources from federal, state, and local entities.

13.     Relator held various positions at the MSP, including Acting Police Chief of the St. Michael's Police Department in 2006 and Chestertown and Centreville Police Departments in 2008. The MSP also assigned Relator to various operations as the Commander or Lead Commander, including: Commander of Princess Anne Barrack in Somerset County; Commander of the Mobile Field Force; Commander of the Special Operations Division; Commander of the Underwater Recovery Unit; Commander of the CRASH Team; Lead Commander at the 2009 Inauguration of Barack Obama; and Lead Commander of the "Sailabration" Event; Assistant Commander of the Strategic National Stockpile; MSP also assigned him to provide protection for former Vice-President Dick Cheney, former U.S. Secretary of Defense Donald Rumsfield, and Abdullah II bin Al-hussein, the King of Jordan.

14.     In 2013, Relator received a Governor's Citation, which is the highest award presented by the government of Maryland for valor, honoring the Relator's exceptional services during Hurricane Sandy.

15.     Relator earned a Bachelor of Science degree in Political Science from Salisbury University. Upon graduation, he received specialized training from the Maryland State Police Academy.

16.     Since June of 2018, Relator has worked as a Part-Time Certified Police Officer at the Fruitland Police Department in Fruitland, Maryland.

### Defendant Maryland Broadband Cooperative

17.     Maryland Broadband Cooperative ("MdBC") is a non-profit organization created in 2006 by the Maryland General Assembly. The company provides access to broadband services through a fiber optic network. MdBC serves rural Maryland and Virginia by building broadband networks across the rural communities on the Eastern Shore and in Southern and Western Maryland, supported by its members who provide "last mile" service. The "last mile" is a phrase widely used in the telecommunications, cable television, and internet industries to refer to the final step of the telecommunication networks that provide telecommunication services to end-users.

18.     The company is a business registered in Virginia, with its principal office at 2129A Northwood Drive, Salisbury MD 21801.

19.     The first phase of MdBC's initiative began with connecting Wallops Island, Virginia across the Chesapeake Bay Bridge, using federal and state funding.

20.     Since then, MdBC actively partnered with various federal, state, and local agencies to construct and add to the network, offering Ethernet transport, fiber splicing, dark fiber leading, and network monitoring.

21.     Currently, MdBC is comprised of 11 staff members, including network technicians and fiber technicians. Drew Van Dopp is the President & CEO. Robert Thompson is the Chief Operating Officer, and Tyler Patton is the Vice President, Public Affairs.

22.     MdBC is comprised of 11 Board Members. During the events giving rise to this suit, Danny Jobe was the Board Chairman and Jim McCormick was the Vice Chairman. Mr. Jobe

was replaced by Tom Dennison and Mr. McCormick was replaced by Brian Roche at MdBC's annual meeting in November of this year.

### Defendant W. Patrick Mitchell

23.     W. Patrick Mitchell is the former president and CEO of MdBC.  In 2006, when MdBC was created, the Board appointed Mr. Mitchell as project manager.  In 2008, the Board promoted him to Executive Director.  One year later, the Board promoted Mr. Mitchell to President/CEO and he held this position until January 2019. As president and CEO of MdBC, Mr. Mitchell oversaw various grant initiatives involved in creating an Internet backbone throughout the state.

24.     Upon graduating from high school, Mr. Mitchell became a master electrician working for a number of companies in the Eastern Shore of Maryland.  In 1999, Mr. Mitchell worked for Verizon at a mid-level position.  He left Verizon to work for MdBC.

25.     Mr. Mitchell is a key figure in the fraud schemes alleged in this Complaint. Instead of ensuring that MdBC used grant funds for increasing broadband access and speed, he improperly embezzled grant funds that MdBC received and misused them for personal enrichment.

### Defendants Wayne Kacher, Bel Air Underground Services, Inc. and Pro Comm Engineering & Locating Services, LLC

26.     Founded in 2006, Bel Air provides general contracting services such as constructing water and sewer mains.

27.     The company is registered in Maryland, with its principal office at 302 Brunswick Drive, Bel Air, Maryland 21015.

28.     Pro Comm offers underground utility locating and engineering services.

29.     Mr. Kacher, is the CEO of Bel Air and Pro Comm.  He formed both companies after his boss, Felix Dialoiso, who owned and operated LAI Construction Services, stopped working with MdBC.

30.     In MdBC's early days, it contracted with LAI Construction Services.  Mr. Mitchell got to know both Mr. Dialosio and Mr. Kacher through MdBC's contracting relationship with LAI Construction Services.

31.     On one occasion, Mr. Mitchell paid Mr. Dialosio up front for a job that was never finished by LAI Construction Services.  However, Mr. Mitchell never pursued Mr. Dialosio or his company for breach of contract. Instead, he started to work with Mr. Kacher under the auspices of his two newly formed companies.

32.     Mr. Mitchell had a close friendship with Mr. Kacher. As he had previously done with Mr. Dialosio, Mr. Mitchell instructed MdBC to pay Mr. Kacher up front for all the services provided by Bel Air. According to Mr. Mitchell, Mr. Kacher was "hurting for money."

33.     Moreover, Mr. Mitchell contracted with Pro Comm for approximately $100,000 a year. He announced to MdBC that Pro Comm was handling all of the locating services for MdBC.

34.     On many occasions, Bel Air and Pro Comm failed to perform various fiber optic network services but MdBC still paid them. In turn, MdBC and Mr. Mitchell billed against the grant for charges never incurred by Bel Air and Pro Comm.

35.     Moreover, in order to facilitate the fraudulent subcontracting relationships, Mr. Mitchell paid kickbacks to Mr. Kacher, regardless of whether the services were performed or not. MdBC and Mr. Mitchell knew that they could subsequently bill for those costs under a grant project.

36. At all times relevant, MdBC and Mr. Mitchell engaged in a conspiracy with Mr. Kasher, Bel Air, and Pro Comm to facilitate the bid-rigging and kickback schemes alleged in this Complaint.

## LEGAL BACKGROUND

### A. *False Claims Act ("FCA")*

37. The FCA provides in, pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or Fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a False record or statement material to a false or fraudulent claim;
>
> (a)(1)(C) conspires to defraud the Government by getting a false or Fraudulent claim allowed or paid; or
>
> …
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> …
>
> is liable to the United States for any civil penalty, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-401, [which is currently not less than $10,957 and not more than $21,916] plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729.

38. For purposes of the False Claims Act, the terms "knowing" and "knowingly" mean that a person, with respect to information: (i) has actual knowledge of the information; (ii) acts in

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b).

39. The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

40. The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

41. The FCA contains an independent requirement to correct errors that will cause, or have caused, a government overpayment. The Act attaches liability to anyone who knowingly makes, uses, or causes to be made or used, a false statement or record material to an obligation to pay or transmit money to the government, or who knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the government. 31 U.S.C. § 3729(a)(1)(G).

42. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410), the FCA civil penalties were adjusted to not less than $10,957 and not more than $21,916.

**B.** *__Anti-Kickback Act__*

43. Prosecutions under the Anti-Kickback Act of 1986, 41 U.S.C. § 51 *et seq.*, must establish the following:

(1) Prohibited conduct – the Act prohibits attempted as well as completed "kickbacks," which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any knowing. The act also provides that the inclusion of kickback amounts in contract prices is prohibited conduct in itself.

(2) Purpose of kickback – the Act requires that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment. It is intended to embrace the full range of government contracting. Prior to 1986, the "kickback" was required to be for the inducement or acknowledgement of a subcontract.

(3) Covered class of "kickback" recipients – the Act prohibits "kickbacks" to prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act.

(4) Type of contract – the Act defines kickbacks to include payments under any government contract. Prior to this legislation, the statutes' applicability was limited to negotiated contracts.

(5) Knowledge and willfulness – the Act requires one to knowingly and willfully engage in the prohibited conduct for the imposition of criminal sanctions.

41 U.S.C. § 51 *et seq.*

44.    By virtue of any AKA violation, entities are also liable under the FCA. In other words, a claim resulting from a kickback is false or fraudulent, creating liability under the FCA.

### C. *Federal Grant and Cooperative Act*

45.    Congress passed the Federal Grant and Cooperative Agreement Act (the "Act") in the 1970s to address concerns over the perceived misuse of assistance agreements, such as circumventing competition and procurement rules. Accordingly, the Act established government-wide criteria for guiding government agencies in their use of federal funds, particularly distinguishing between contracts, cooperative agreements, and grants. Public Law 95-224 Feb. 3, 1978.

46.    The recipient receives both grants and cooperative agreements, which are at issue in this case, when a government agency is providing assistance to the contract and/or there will be substantial involvement in performing the contract by the government agency.

47.     Cooperative Agreements reflect the relationship between the federal government and a state and local government or other recipient whenever—

> (1) the principal purpose of the relationship is to transfer of money, property, services, or anything of value to the State or local government or other recipient to accomplish a public purpose of support or stimulation authorized by Federal statute, rather than acquisition, by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government; and

> (2) substantial involvement is anticipated between the executive agency, acting for the Federal Government, and the State or local government or other recipient during performance of the contemplated activity.

48.     Grant fraud awarded under these Cooperative Agreements typically occurs when recipients deceive the government as to the spending of award money.

49.     In 2009, the National Procurement Fraud Task Force established guidelines for grant oversight, noting that recipients of federal grants are subject to specific regulations, oversight, and audit.

50.     Using federal and state grant dollars for unjust enrichment, personal gain, or other than their intended use is a form of theft, subject to criminal and civil prosecution under the laws of the United States.

### D. *The Recovery Act and the Broadband Technology Opportunities Program*

51.     Broadband infrastructure serves as a key engine of economic development, enabling communities to attract, retain, and expand job-creating businesses and institutions.

52.     To fulfill statutory objectives through the Broadband Technology Opportunities Program ("BTOP"), the Department of Commerce and the National Telecommunications and Information Administration ("NTIA") awarded Recovery-Act (American Recovery and Reinvestment Act of 2009) funded grants in project categories including deploying infrastructure.

53.     The bulk of BTOP investments awarded fund the construction or upgrade of approximately 120,000 miles of broadband network employing technologies, such as fiber-optics, wireless, and other technologies.

54.     The vast majority of these investments are for high-speed, high-capacity "middle mile" infrastructure. The "middle mile" is the segment of a telecommunications network linking a network operator's core network to the local network plant.

55.     By way of background, at the highest level is the national "internet backbone," which consists of the principal data routes that transport massive amounts of Internet traffic within and between countries and even continents. The local community level is the "last mile" connection, in which a local broadband provider (such as a phone or cable company) delivers high-speed Internet for residential homes and/or small businesses.

56.     Pertinent to our case here is the link between the highest level and the local last mile connection, which is the "middle mile." The NTIA provides funding for BTOP award projects that delivers high-speed "middle mile" networks and connects community anchor institutions to broadband.

57.     The "middle mile" projects under the BTOP must adhere to open network requirements and ensure that any requesting party, such as a last-mile service provider, can utilize the new infrastructure to provide service to homes and businesses.

58.     Non-profit organizations like MdBC are generally eligible to apply for funding opportunities under the BTOP. The federal government awards more than $500 billion annually to various non-profit organizations in Federal Assistance Agreements under the BTOP.

59.     Unfortunately, federal grant dollars paid under BTOB awards are susceptible to several forms of financial thefts, most commonly in the form of federal violations, including

embezzlement; theft or bribery; false claims; and false statements and documentation, all of which are violations of the federal and state False Claims Acts.

## FACTS AND ALLEGATIONS

60.     From at least 2013 through the present, MdBC improperly spent millions of dollars in grant funds associated with various "middle mile" projects. Instead of properly carrying out the goals and objectives identified in each grant project, Mr. Mitchell, former president and CEO of MdBC, treated the grant funds MdBC received as his own personal checking account.

61.     Moreover, to conceal the fraud, Mr. Mitchell allocated business to the same two companies – Bel Air and Pro Comm - to perform various services for MdBC grant projects. In order to maintain those sham relationships, Mr. Mitchell paid kickbacks in the form of exceedingly high service payments to these contractors, knowing that he could subsequently bill for those costs under a grant project. Often, these subcontractors did not actually perform the work, although MdBC represented to the government as the opposite.

62.     Mr. Mitchell first approached the Relator about working for MdBC in 2013. The Relator previously helped coordinate a funeral for Mr. Mitchell's father, who was a retired police officer, and Mr. Mitchell took a personal liking to Relator and to Relator's work.

63.     Mr. Mitchell told Relator that he "owned" MdBC and started it out of his garage.

64.     At the time, Relator declined the employment offer, explaining to Mr. Mitchell that he had about two years left in MSP's Deferred Retirement Options Program.

65.     However, Mr. Mitchell was persistent in trying to change the Relator's mind. In order to entice the Relator to retire early from the MSP, Mr. Mitchell improperly spent grant funds to pursue the Relator to work for him. For example, Mr. Mitchell promised to recoup Relator's loss from retiring early at MSP by allowing the Relator to work at MdBC for the next ten years.

66.     During the overly tenacious recruiting process, Mr. Mitchell made statements like, "I want to work with you [(Relator)] because you [(Relator)] will never steal from me."

67.     This is one of the many examples of Mr. Mitchell's efforts to keep his inner circle small and close to him so that he could fraudulently operate MdBC. Mr. Mitchell also sought out Relator and other law enforcement officials out to give the appearance of his proprietary.

68.     After many months of Mr. Mitchell pursuing the Relator, Relator finally accepted the offer, agreeing to an official start date of January 2015.

69.     A few months into working at MdBC, Relator learned Mr. Mitchell did not, in fact, own the company and came across numerous invoice statements and billing transactions related to grant projects that confused him. For example, he saw line items billed against grant projects that did not match up with the work performed for each project. He grew suspicious of them and speculated that MdBC misallocated and misused large sums of the grant funds for reasons he could not piece together at the time.

70.     Relator later realized that his observations amounted to Mr. Mitchell and MdBC's grand scheme for fraud in various forms, which included Bel Air, Pro Comm, and Mr. Kacher.

### A.     *MdBC and Mr. Mitchell Routinely Embezzled Grant Funds For Unauthorized Expenses*

71.     There was no doubt that the former CEO of MdBC was a big spender. What the Relator did not know at the time was that Mr. Mitchell was spending federal and state money for his personal enrichment.

72.     Mr. Mitchell and MdBC knowingly and deliberately misallocated grant funds to unauthorized use for fraudulent reasons, one of which was to maintain Mr. Mitchell's improper spending habits through MdBC grant funds.

73. One of the major grant projects awarded to MdBC was the **PAX River Project (or "the PAX project").** As indicated by several notable examples here, Mr. Mitchell frequently billed expenses to this project, embezzling grant funds and improperly charging the project for personal expenses and unnecessary business expenses.

74. On January 6, 2010, MdBC was awarded the Cooperative Agreement with the Naval Air Warfare Center, Aircraft Division ("the Navy") (also known as the federal awarding agency) on behalf of the United States, "for the deployment of technology supporting infrastructure; specifically world-class broadband network across the rural communities of Eastern, Southern, and Western Maryland." Cooperative Agreement, Amendment of Solicitation/ Modification of Contract N00421-08-2-0001.

75. The Cooperative Agreement described MdBC as:

> a public/private cooperative to promote economic development through the deployment of technology supporting infrastructures. MdBC's mission is to drive economic development through universal, open access to broadband services via a fiber optic network that serves rural Maryland by building an advanced, world-class broadband network across the rural communities of Eastern, Southern, and Western Maryland supported by its members who provide "Last Mile" services. A portion of the fiber optics network footprint that MdBC is working to establish across the state of Maryland is identical to that of the Navy (e.g. the Pax to WFF).

Cooperative Agreement, Amendment of Solicitation/ Modification of Contract N00421-08-2-0001.

76. The project contained distinct components. Thus, pursuant to the contract, the Navy required MdBC to perform construction in phases and milestones. Below is a section from the amended contract, indicative of the planned phases that were completed by MdBC versus those that still needed work:

| | |
|---|---|
| Phase I, Land Segment 1 – | Wallops to Westover Duct only – Completed |
| Phase II, Land Segment 2 – | Wallops to Cambridge –Completed |
| Phase II, Land Segment 3 – | Westover to Fairmont Tower Site - Completed |
| Phase III/IV, Milestone I -- | Environmental Engineering Chesapeake Bay Crossing, |
| Phase III, Milestone II | Church Creek Rd (Hyatt), Cambridge to Taylors Island |
| Phase IV, Milestone III -- | Chesapeake Bay Crossing Taylors Island to Cove Point |
| Phase V, Milestone IV | Western Shore Land Segment - Cove Point to Patuxent River, |
| CLIN 0002 OPTION: | |
| Phase VI Milestone V | Western Shore Land Segment – Patuxent River to Pt. No Point |

77.    The Navy required MdBC to complete the milestones required of the project,

paying MdBC a total of $11,719,993.45 in federal funds. MdBC was supposed to contribute an

additional $8,883,181.05 of its own funds to complete the project.

COOPORATIVE AGREEMENT
**COOPERATIVE AGREEMENT NO:** N00421-08-2-0001

**TOTAL ESTIMATED CUMULATIVE AMOUNT OF AGREEMENT,**
IF FULLY FUNDED AND ALL MILESTONES COMPLETED:

| | | | | | |
|---|---|---|---|---|---|
| GOVT SHARE: | **FROM** $ 9,748,633.75 | **BY** $1,971,359.70 | **TO** $11,719,993.45 |
| MdBC SHARE | **FROM** $ 8,429,181.05 | **BY** $454,000.00 | **TO** $8,883,181.05 |

**TOTAL CUMULATIVE**
**VALUE:**      **FROM**    **$18,177,814.80  BY  $2,425,359.70  TO  20,603,174.50**

**Obligated Funding:** This Cooperative Agreement is incrementally funding in the amount of
**$8,801,919.00.** The Government's obligation to make payments to the Grantee is limited to only those
funds obligated by this Agreement. Or by modification to this Agreement. Subject to availability of
funds and continued satisfactory progress on the Agreement as determined by the Government, the
Government agrees to provide funding based on the milestone schedule shown in ARTICLE 7.

**The Government will issue a bi-lateral modification for a Notice to Proceed (NTP) to the next**
**Milestone.**

**Authority:  10 U.S.C. § 2358 as amended and 31 U.S.C. § 6304**

78.    The government agreed to pay MdBC in accordance with the milestone schedules

detailed in the contract, based on predetermined measures of technical progress or other defined

milestones.

79.     In addition, "[i]nterim payments [could] be requested monthly by [MdBC] for reimbursement of the Government's share of incurred costs." Section 7.5 Payments of the Cooperative Agreement. Such interim payments were valid as long as MdBC's cost share contribution for costs incurred was in accordance with the ratio[1] specified in the payable milestone schedule.

80.     The terms of the contract required MdBC to submit invoices for payments and reimbursements, accompanied by adequate supporting documentation. The reporting requirements attachment of the contract defines the purpose of payment documentation, highlighting the need for specific details in support of each request for payment.

1.2     Payment Documentation

Payment Documentation - In support of each request for payment (invoice or SF-270) the following information must be supplied to the Program Officer with a copy to the Agreements Administration Officer:

    - A breakdown of the total requested payment by milestone or task;
    - A breakdown of the cost sharing provided to date for each milestone or task;
    - A copy of the Program Officer's certification that the milestone has been completed;

81.     As such, MdBC billed for progress payments as subcontractors submitted invoices to them.

82.     Despite strict requirements for honest and accurate information stated in the contract, Relator noticed invoices for Milestone projects that did not add up to the work actually performed for the PAX project.

---

[1] The total amount of interim payments could not exceed 80% of the milestone value as specified in the payable milestone schedule. The 20% not allowed under interim payments could be withheld until approval of milestone completion by the designated NAWCAD Program Manager.

83. Relator had already been uneasy about Mr. Mitchell's pattern of spending and had overheard various conversations about it within the company amongst executive-level employees, including Scott Brent, Robert Thompson, Jody Neal, and Michelle Smethurst.

84. Through internal conversations with various higher ups at MdBC, Relator also heard about events that occurred prior to his tenure at MdBC. For instance, he learned that, early in the building stages of the PAX project, Rob Thompson, COO, was heavily involved in managing the project. However, in 2015, around the time Relator began working for MdBC, the Department of Defense started to question Mr. Thompson about increased costs and the numbers not adding up.

85. From that point forward, Mr. Mitchell immediately started to handle the entire project on his own. According to Mr. Mitchell, the PAX Project was one that "no one but himself could handle."

86. Relator's suspicions were later confirmed when the Relator discovered documentation for the fraudulent invoice payments.

87. At MdBC, Mr. Mitchell misappropriated grant funds in at least two different ways.

88. First, Mr. Mitchell routinely charged personal expenses and unnecessary business expenses against the PAX project. In doing so, MdBC fabricated numerous invoice payments for reimbursement and submitted false claims to the government.

89. For example, on September 2016, Mr. Mitchell purchased a costly boat using grant money from the PAX project. The cost of the boat was $20,000 plus $3,500 for related additional expenses.

90.     Initially, Mr. Mitchell purchased the boat and billed it to the PAX project, representing to the government that MdBC used the boat for viewing the progress of the Chesapeake Bay Crossing Project (Phase III/IV, Milestone I).

91.     However, upon purchase, Mr. Mitchell immediately parked the boat at his residence and MdBC did not use the boat for any project, let alone for monitoring the progress of the Chesapeake Bay Crossing Project. Mr. Mitchell told Relator that his son had used the boat for duck hunting and had almost flipped it.

92.     Regardless, the boat was billed as "Chesapeake Bay Subcable Consult," indicated in MdBC's internal transaction records below:

| Date | Num | Name | Memo | Account | Class | Clr | Split | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| 09/17/2016 | 7835 | Goldborough Marina | | 100400 · HSB Checking account | | | 512113 · Chesapeake Bay Subcable Consult | | 20,000.00 | 20,000.00 |
| 09/17/2016 | 7835 | Goldborough Marina | | 512113 · Chesapeake Bay Subcable Consult | Non grant constr. projects:PAX | | 100400 · HSB Checking account | 20,000.00 | | 0.00 |
| 09/23/2016 | 7840 | Goldborough Marina | | 100400 · HSB Checking account | | | 512113 · Chesapeake Bay Subcable Consult | | 3,418.22 | -3,418.22 |
| 09/23/2016 | 7840 | Goldborough Marina | | 512113 · Chesapeake Bay Subcable Consult | Non grant constr. projects:PAX | | 100400 · HSB Checking account | 3,418.22 | | 0.00 |
| | | | | | | | | 23,418.22 | 23,418.22 | 0.00 |

93.     Despite purchasing the boat, misrepresenting to the government that MdBC had used it for viewing the Chesapeake Bay Crossing Project and billing for it as such, Mr. Mitchell charged the PAX project a second time for another boat in 2018. He hired Larry Tawes, the owner of a fishing charter boat and a close friend, to monitor the Chesapeake Bay Crossing Project (Phase III, IV, Milestone I), at a rate of $10,000 for four days to "take a look" at the progress of the PAX project.

94.     In other words, MdBC billed the costs for using Mr. Tawes' boat against the PAX project for the same reason indicated for the purchase of the first boat in 2016. Despite MdBC's

representations that the first boat was necessary for the Chesapeake Bay Crossing Project, MdBC did not use the boat for any grant project.

95.    In addition, MdBC also billed expenses for the entire trip to the PAX project. Mr. Mitchell and Mr. Tawes were on the water for four days, supposedly monitoring the Chesapeake Bay Crossing Project. Mr. Mitchell spent approximately $1,000.00 in food and $200.00 in alcohol and cigarettes. The various supporting documents show invoices for the boat trip and the unnecessary business expenses charged against the PAX project.

96.    The first invoice shows that Mr. Mitchell billed $912.42 for the "Boat Trip Chesapeake Crossing."

Jody Neal

8/31/2018

| Date | Place | Amount | Purpose | Account | Class |
|---|---|---|---|---|---|
| Gas | | | | | |
| 8/15/2018 | Exxonmobil | 32.00 | Edge | | |
| | | 32.00 | 611020 - Automotive Fuels expense | Admin | |
| Office Supplies | | | | | |
| 8/13/2018 | Walmart | 66.89 | Paper plates, soda, water etc | | |
| 8/28/2018 | Sams Club | 33.61 | Coffee for office | | |
| 8/30/2018 | Keurig Green Mountain | 47.47 | Coffee for office | | |
| 8/30/2018 | Food Lion | 39.38 | Soda and water | | |
| | | 187.35 | 609000 - Office Supplies | Admin | |
| Board meetings | | | | | |
| | | - | 535110-Board meetings/meals | Admin | |
| PAX | | | | | |
| 8/14/2018 | Taylors BBQ | 46.11 | Boat trip-Chesapeake crossing | | |
| 8/15/2018 | Eastside Deli | 335.70 | Boat trip-Chesapeake crossing | | |
| 8/15/2018 | Jersey Mikes | 122.96 | Boat trip-Chesapeake crossing | | |
| 8/15/2018 | Wetcher Whistle | 52.80 | Boat trip-Chesapeake crossing | | |
| 8/16/2018 | Taylors BBQ | 75.55 | Boat trip-Chesapeake crossing | | |
| 8/16/2018 | Walmart | 43.38 | Boat trip-Chesapeake crossing | | |
| 8/17/2018 | Eastside Deli | 198.84 | Boat trip-Chesapeake crossing | | |
| 8/17/2018 | Royal Farms | 37.08 | Boat trip-Chesapeake crossing | | |
| | | 912.42 | 512110-PAX | Admin | |
| Marketing | | | | | |
| | | - | 602130-Special Events | Marketing | |
| Meals - Staff | | | | | |
| | | - | 635160 - Employee relations & Meals | Admin | |
| Misc Auto | | | | | |
| | Sirius XM | | Sirius radio | | |
| | Sirius XM | | Sirius radio | | |
| | | - | 611050 - Misc auto exp | Admin | |
| | | 1,131.77 | | | |

Acct: See Above
Class: See Above

97.   MdBC internally named the charges as "admin" and subsequently billed to the PAX

project for reimbursement.

98.   Snapshots of credit card statements below confirm the type of expenses spent for

the four-day boat trip.

# M&T Bank    *M & T One Card*

| JODY NEAL | | ACCOUNT NUMBER | XXXX-XXXX-XXXX-7937 |
|---|---|---|---|
| **CREDIT LIMIT** | **AVAILABLE CREDIT** | **DAYS IN BILLING CYCLE** | **STATEMENT DATE** |
| $2,500.00 | $2,500.00 | 31 | 08/31/18 |

## ACCOUNT SUMMARY

| Purchases | Cash Advances | Total Fees | Credits | Total Activity |
|---|---|---|---|---|
| $1,131.77 | $0.00 | $0.00 | $0.00 | $1,131.77 |

## CARDHOLDER ACTIVITY

| Tran Date | Post Date | Reference Number | Transaction Description | Amount |
|---|---|---|---|---|
| 08/13 | 08/14 | 09226400124371390 | WM SUPERCENTER #1890    SALISBURY    MD | 96.99 |
| | | | MCC: 5411    MERCHANT ZIP: 21801 | |
| | | | LOCAL TAX: 3.55   LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| 08/14 | 08/15 | 54227400718000515 | TAYLORS BBQ    SALISBURY    MD | 49.11 |
| | | | MCC: 5812    MERCHANT ZIP: 21804 | |
| 08/15 | 08/16 | 28227900010900084 | EAST SIDE DELICATESSEN INSALISBURY    MD | 335.70 |
| | | | MCC: 5499    MERCHANT ZIP: 21804 | |

*(handwritten margin notes: "Office/Break rm", "Boot trip", "Boot trip")*

| CARDHOLDER SIGNATURE | DATE | MNGR |
|---|---|---|

For customer service, call
toll free (900) 443-9671
Outside the US and Canada, call
(716) 635-4152

Account ID: 00000066447

To write M & T Bank regarding:
Billing errors: P.O. BOX 4028, Buffalo, NY 14240-4028
Payments: P.O. BOX 62126, Baltimore, MD 21264-2120
Lost/Stolen: 1100 WEHRLE DR. 2ND FLOOR, Buffalo, NY 14221

Visit us on the web at www.mtb.com

For Visa benefits and
referral services, call
the Visa assistance
Center at (800) VISA-911

## MEMO STATEMENT

**M & T BANK**
P.O. BOX 4028
BUFFALO, NY 14240-4028

| Account Number | XXXX-XXXX-XXXX-7937 |
|---|---|
| Statement Date | 08/31/18 |
| Total Activity | $1,131.77 |

Remit to: M & T BANK

## CARDHOLDER ACTIVITY

| Tran Date | Post Date | Reference Number | Transaction Description | Amount |
|-----------|-----------|------------------|-------------------------|--------|
| 08/15 | 08/16 | 98227083757763850 | JERSEY MIKES ONLINE ORDE 800-321-7676 NJ | 122.96 |
| | | | MCC: 5814    MERCHANT ZIP: 08736 | |
| | | | LOCAL TAX: 7.64  LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| 08/15 | 08/16 | 7822820057610065S | WETCHER WHISTLE       SALISBURY   MD | 52.80 |
| | | | MCC: 5921    MERCHANT ZIP: 21804 | |
| | | | LOCAL TAX INDICATOR: 2 | |
| | | | NAT. TAX INDICATOR: 0 | |
| | | | DEST. POSTCODE: 000000000 | |
| 08/16 | 08/16 | 5822640071900051S | TAYLORS BBQ         SALISBURY   MD | 75.55 |
| | | | MCC: 5812    MERCHANT ZIP: 21804 | |
| 08/15 | 08/17 | 58226378001180807 | EXXONMOBIL   47620505 MARDELA SPRINMD | 32.00 |
| | | | MCC: 5542    MERCHANT ZIP: 21837 | |
| | | | TIME: 10:43   SERV: S   UNIT OF MEASURE: G | |
| | | | FUEL TYPE: 01  UNIT COST: 2.66  FUEL ONLY: 1 | |
| | | | GROSS PRICE: 32.00   ODO: 0000000 | |
| | | | REF: 00000000000000000 | |
| 08/16 | 08/17 | 88229400001316948 | WAL-MART #1890       SALISBURY   MD | 43.38 |
| | | | MCC: 5411    MERCHANT ZIP: 21801 | |
| | | | ORDER NUMBER: 0816181890 | |
| | | | LOCAL TAX: 1.95  LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| 08/17 | 08/20 | 28229900011100019 | EAST SIDE DELICATESSEN INSALISBURY   MD | 198.84 |
| | | | MCC: 5499    MERCHANT ZIP: 21804 | |
| 08/17 | 08/20 | 68230100700434606 | ROYAL FARMS 127      SALISBURY   MD | 37.06 |
| | | | MCC: 5541    MERCHANT ZIP: 21801 | |
| | | | ORDER NUMBER: 00000000000000000000 00000 | |
| | | | LOCAL TAX: 2.10  LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| | | | MERCH ORDER #: 000000002000 | |
| | | | TIME: 8:36   SERV: S | |
| | | | FUEL ONLY: 2 | |
| | | | REF: 00000000000000000 | |
| 08/28 | 08/29 | 08241400119995352 | SAMS CLUB #6383      SALISBURY   MD | 33.61 |
| | | | MCC: 5300    MERCHANT ZIP: 21801 | |
| | | | LOCAL TAX: 0.36  LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| 08/30 | 08/31 | 6824210032166687? | KEURIG GREEN MOUNTAIN  866-901-2739 VT | 47.47 |
| | | | MCC: 5999    MERCHANT ZIP: 05676 | |
| 08/30 | 08/31 | 38242720014931687 | FOOD LION #1268      SALISBURY   MD | 39.38 |
| | | | MCC: 5411    MERCHANT ZIP: 21801 | |
| | | | LOCAL TAX: 1.00  LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |

*(Handwritten annotations in right margin: "Boat trip", "Boat trip", "Boat trip", "Boat trip", "Boat trip", "Boat trip", "coffee - office", "coffee - office")*

99.    In addition, snapshots of the receipts below match some of the credit card

transactions.



**FOOD LION**

MILLER LITE 30 PK CANS 12 OZ
034100573416      5 @ 20.89    104.45
COORS LIGHT 30 PK CANS (712 12 OZ
071990300302      1 @ 20.89     20.89
MARLBORO GOLD L CIGARETTES
283842            5 @ 7.15      35.75

Nbr of Items: 11

            Sub-Total:      161.09
            Liq Tax:         11.28
            Sales Tax:        2.15
            Total:          174.52

Paid by Credit\Debit:       174.52

            Change Due:        0.00

TYPE:    credit sale
ACCT:    5825
ENTRY:   Chip
NAME:    MISCELLANEOUS/MISCELLANEOU
APPROVAL 074865
APP NAME VISA CREDIT
AID:    A0000000031010
TC:     942E1300D170318A
CVM:    Signature

***MERCHANT COPY ***

ZQR107I9/5 1

8/14/2018        Sta  1 Clerk  10
11:19 AM         INV  1078975

---

1001 Race St
Cambridge Md 21613

SNOWS TURN
PIXP202601
1001 RACE STREET
CAMBRIDGE, MD
21613
08/17/2018 94398997
09:03:53 AM

XXXXXXXXXXXX5825
Visa Fleet
INVOICE 0666
AUTH 082432
REF 0666

PUMP# 9
DIESEL           20.339
PRICE/GAL        $2.99

FUEL TOTAL   $   61.8
CREDIT       $   61.8



**M&T** Bank    *M & T One Card*

| MISCELLANEOUS | | | ACCOUNT NUMBER | XXXX-XXXX-XXXX-5825 |
|---|---|---|---|---|

| CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | STATEMENT DATE |
|---|---|---|---|
| $2,500.00 | $2,500.00 | 31 | 08/31/18 |

### ACCOUNT SUMMARY

| Purchases | Cash Advances | Total Fees | Credits | Total Activity |
|---|---|---|---|---|
| $1,083.36 | $0.00 | $0.00 | $0.00 | $1,083.36 |

### CARDHOLDER ACTIVITY

| Tran Date | Post Date | Reference Number | Transaction Description | Amount |
|---|---|---|---|---|
| 08/14 | 08/15 | 3522672001385984C | FOOD LION #1156      CAMBRIDGE   MD | 31.74 |
| | | | MCC: 5411    MERCHANT ZIP: 21613 | |
| | | | LOCAL TAX: 1.90   LOCAL TAX INDICATOR: 1 | |
| | | | NAT. TAX INDICATOR: 0 | |
| 08/14 | 08/16 | 9822700313235402C | BEST WINE AND SPIRITS  CAMBRIDGE   MD | 5.74 |
| | | | MCC: 5921    MERCHANT ZIP: 21613 | |
| 08/15 | 08/16 | 0822640012210163T | WM SUPERCENTER #2272   CAMBRIDGE   MD | 35.78 |
| | | | MCC: 5411    MERCHANT ZIP: 21613 | |

CARDHOLDER SIGNATURE                    DATE                              MNGR

For customer service, call
toll free (800) 443-8671
Outside the US and Canada, call
(716) 635-4152

Account ID: 00000058529

To write M & T Bank regarding:
Billing errors: P.O. BOX 4028, Buffalo, NY 14240-4028
Payments: P.O. BOX 62120, Baltimore, MD 21264-2120
Lost/Stolen: 1100 WEHRLE DR., 2ND FLOOR, Buffalo, NY 14221

Visit us on the web at www.mtb.com

For Visa benefits and
referral services, call
the Visa assistance
Center at (800) VISA-911

M & T BANK
P.O. BOX 4028
BUFFALO, NY 14240-4028

### MEMO STATEMENT

| Account Number | XXXX-XXXX-XXXX-5825 |
|---|---|
| Statement Date | 08/31/18 |

100.    In short, the boat trip with Mr. Tawes was a personal expense, not a necessary business expense. However, Mr. Mitchell fraudulently purchased the first boat in 2016 for personal use. Moreover, MdBC should not have billed twice for the same Milestone project, embezzling grant funds for improper business expenses.

101.    In another example, sometime in 2016, Mr. Mitchell purchased a camera for $245.30 and a telescopic lens for $1409.97. Later in 2018, Mr. Mitchell bought another camera for $2,003.37.

102.     MdBC billed both purchases under the PAX project, representing that MdBC used the equipment for photographing the progress of the PAX project.

103.     Similar to the method used for the purchase of the boat and the subsequent boat trip, MdBC charged the camera under the PAX project. Below is a portion of the internal billing record that shows the purchase:

| | | | | |
|---|---|---|---|---|
| 8/9/2018 Cambridge Diner | 55.54 | Marketing-Betail | | |
| | **1,167.77** | | 602141 - Mktg Meals | Marketing |
| **Staff meals/meetings** | | | | |
| 8/2/2018 Cambridge Diner | 55.54 | Staff meal | | |
| 8/2/2018 Walmart | 210.98 | Staff meal | | |
| 8/10/2018 Romanos | 49.02 | Staff meal | | |
| 8/10/2018 Suicide Bridge | 248.96 | Staff meal | | |
| 8/12/2018 Verona Pizza | 34.17 | Staff meal | | |
| 8/13/2018 Walmart | 394.58 | Staff meal | | |
| 8/13/2018 Cindy Eastside Kitchen | 30.00 | Staff meal | | |
| 8/19/2018 Red Roost | 460.20 | Staff meal | | |
| 8/21/2018 Cindy Eastside Kitchen | 20.00 | Staff meal | | |
| 8/22/2018 Suicide Bridge | 373.56 | Staff meal | | |
| 8/28/2018 Pep Up | 109.85 | Staff meal | | |
| | **1,986.86** | | 635160 - Employee relations/re | Admin |
| **Misc Office Exp** | | | | |
| 8/9/2018 Best Buy | 2,003.37 | Camera | Job-Naval Air  - *Pax* | |
| 8/9/2018 Stanley Steamer | 262.40 | | *Admin*   *Admin* | |
| | **2,265.77** | | 606140-Misc Office Exp   *pax* | |
| **Special Events** | | | | |
| 8/7/2018 Reeds Family Outdoor | 25.00 | Marketing | | |
| 8/8/2018 White Marlin Open | 368.00 | Marketing | | |
| | **393.00** | | 602130-Special event | Marketing |
| **Airfare/car rental** | | | | |
| 8/1/2018 Richards Taxi | 120.00 | Travel | | |
| 8/8/2018 Lyft | 16.29 | Marketing | | |
| 8/9/2018 Lyft | 49.65 | Marketing | | |
| | **185.94** | | 635220-Airfare/rental car | Marketing |
| **Internet** | | | | |
| 8/3/2018 Direct Tv | 318.67 | | | |
| 8/15/2018 Apl iTunes | 0.99 | | | |
| | **319.66** | | 639200 - Internet | Admin |
| **Exterminator** | | | | |
| | | | 604094-Exterminator | Admin |
| **Cell Phone** | | | | |
| 8/19/2018 Verizon Wireless | 410.44 | | | |
| | **410.44** | | 639120 - Cell Phone | Admin |
| **EZ Pass** | | | | |
| 8/29/2018 Ezpass | 25.00 | | | |
| | **25.00** | | 635210 - EZPass | Admin |
| | 17,052.38 | | | |

104.     However, MdBC never used the cameras for any work purpose, let alone to monitor the PAX project. Coincidentally, Mr. Mitchell's wife started photography as a hobby around the time that Mr. Mitchell purchased the first camera in 2016.

105.     In addition to purchasing properties and goods for personal use, MdBC also billed the PAX project for services performed for Mr. Mitchell's home in Maryland.

106.     On November 30, 2016, MdBC billed $5,276.18 to the PAX project, noting services for "Restoration Bay Crossing – Taylor's Island," which refers to Phase IV, Milestone III of the planning phase for the PAX project. MdBC uses an internal software system to create an invoice statement like the below and submits it to the government as supporting document for payment.



107.     However, although MdBC billed for Milestone Phase III and represented that MdBC performed and completed the requisite construction, the costs, in fact, were actually for providing landscaping services for Mr. Mitchell's home.

108.     On November 30, 2016, the A+ Lawn & Landscaping billed MdBC for its services amounting to $5,276.18.

109.     In January 2019, Relator came across these invoices in Ms. Smethurst's scanned files and decided to ask Mr. Eric Rickards, the owner of A+ Lawn & Landscaping, about them.

110.      Mr. Rickards stated that he had done several similar projects for Mr. Mitchell and that Mr. Mitchell directed him to fill out the invoice indicating services for, "Restoration Bay Crossing, Taylor's Island."

111.     Although the invoice described the work as Restoration Bay Crossing, Taylor's Island, Mr. Rickards explained that he worked on Mr. Mitchell's "fire pit, landscaping, stone around the pool, front of house, ¾ pea gravel, mulch around trees, gas tank, etc." In January 2019, Mr. Rickards provided handwritten notes detailing the services upon the Relator's inquiry.

A+ Lawn & Landscaping Inc.    Invoice # 07739
30673 Heather Glen Drive    11-30-16
Salisbury, MD 21804
Office 410-546-5530
Cell 443-235-8877

| Name/ Address |
| --- |
| Maryland Broadband Cooperative |
| 2129 Northwood Drive |
| Salisbury, MD 21801 |
| Attn: Pat Mitchell |

| Description of Work | Cost |
| --- | --- |
| Restoration Bay Crossing, Taylor's Island | $5,276.18 |
| Total Due | $5,276.18 |
| 50% deposit: $2,638.09 | |
| Balance Due at completion of job | |

Thank you for your business!
Eric Rickards Owner/ Operator

Fire pit, Landscaping, stone around pool, front of house
3/4 pea gravel, mulch around trees, gas tank ect.

112.     There was no fire pit or pool constructed at Taylor's Island. These were services performed for Mr. Mitchell's home, which MdBC subsequently billed for reimbursement to the PAX project as work for Milestone Phase III.

113.     However, at the time Mr. Rickards submitted the invoices to MdBC, Mr. Rickards had no idea that Mr. Mitchell, on behalf of MdBC, would submit the costs as Taylor's Island.

114.     In the Relator's capacity as the Director of Administration, he observed more entries in MdBC's billing records that demonstrated similar fraudulent transactions involving other supply companies.

115.     For example, MdBC's internal billing record dated September 29, 2017 highlighted an expense labeled as Vulcan Mideast. As indicated, MdBC charged $2,108.70 to the PAX project

as the "Chesapeake Bay Subcable," which would have been necessary for Phase IV, Milestone III – Chesapeake Bay Crossing Taylor's Island to Cove Point.

| | | | | | |
|---|---|---|---|---|---|
| 32 | | | | | |
| 33 | **Pax** | | | | |
| 34 | 9/29/2017 | Vulcan Mideast | 2,108.70 | Pax Job | |
| 35 | | | | 512113 - Chesapeake Bay Subcable | Pax |
| 36 | | | | | |
| 37 | **Misc Vehicles** | | | | |
| 38 | | | | 611050 - Misc Auto Exp | Admin |
| 39 | **Vehicles** | | | | |
| 40 | | | · | 140000 - Vehicles | Admin |
| 41 | | | | | |
| 42 | **Misc** | | | | |
| 43 | 10/5/2017 | Clearwater Pool | 100.00 | | |
| 44 | 10/11/2017 | Clearwater Pool | 265.85 | | |
| 45 | | | 365.85 | 690100 - Misc | Admin |
| 46 | | | | | |
| 47 | **Misc** | | | | |
| 48 | 10/3/2017 | Atlantic Tractor | 2,500.00 | Personal - To be repaid | |
| 49 | 10/12/2017 | Stanley Steamer | 278.80 | Personal - To be repaid | |
| 50 | 10/16/2017 | DNR Licensing | 82.50 | Personal - To be repaid | |
| 51 | | | 2,861.30 | 690100 - Misc | Admin |
| 52 | **Meals** | | | | |

116. However, the Relator later learned that Vulcan Mideast was a building material supplier that delivered stone supplies to Mr. Mitchell for renovating his driveway.

117. This is one of the numerous examples of Mr. Mitchell's home renovation expenses billed to the PAX project, as well as to other grant projects.

118. A few months later, Relator saw the newly renovated driveway and took a photo of it. The services provided by Vulcan Mideast was not for any grant project. However, MdBC billed for the services against the PAX project as such for Mr. Mitchell's personal enrichment.



119.     The representative examples discussed in this section are not a comprehensive list of fraudulent billing that occurred over the course of at least 7 years. These are simply a small subset.

120.     In fact, by the time the Relator started at MdBC, Mr. Mitchell appeared to have complete control of the PAX project. It was easy for him to embezzle grant funds associated with the project by causing MdBC to bill against grants for his personal expenses and unnecessary business expenses.

**B.** **MdBC and Mr. Mitchell Charged the Government for Incomplete Projects and Costs That Were Not Incurred**

121.     Mr. Mitchell and MdBC also misused grant funds by constantly misrepresenting a project's status to continue receiving federal and state government funds.

122.     For most of its grant projects, MdBC received payments in segments, usually for the completion of every phase of the project. In order to receive payment, MdBC had to represent that it continued to work on the grant project, completed delineated phases or tasks, and submitted progress bills for reimbursement payments.

123.     As demonstrated in the examples here, the government would not have made those payments to MdBC, but for MdBC's misrepresentations and false billing claims.

*(a)     The PAX River Project*

124.     Since at least 2014 to 2018, MdBC received progress reimbursement payments from the Navy to continue its work on the PAX project, because the project required five different phases, three land segments and five milestones. Accordingly, the Navy relied on MdBC's accurate and honest submission for reimbursement, including pertinent supporting documents to ensure that MdBC completed milestone projects as indicated.

125.     However, MdBC deliberately misled the Navy by representing that MdBC completed milestone projects when the projects remained unfinished, causing the Navy to pay MdBC for incomplete projects.

126.     During a conversation with Mr. Thompson, which occurred in 2017, the Relator learned of MdBC's wrongdoings that occurred a few years before he started at MdBC.

127.     In 2014, the Navy paid MdBC a total of $3.29 million for completing Phase III, Milestone II, Church Creek Rd (Hyatt), Cambridge to Taylor's Island. According to invoice statements, MdBC represented that it hired and paid at least two different subcontractors to work on the milestone projects and that Milestone II was complete.

128.     Yet, Mr. Thompson informed the Relator that most of Milestone II remained incomplete in 2017.

129.     MdBC initially hired LAI Construction Services, a company owned by Felix Dialoiso, for constructing handholes, conduit, and fiber, all of which were necessary for Milestone II. MdBC paid Mr. Dialoiso up front and then billed the PAX project for reimbursement, representing that MdBC completed the project.

130.     Several months later, MdBC suddenly claimed that Mr. Dialoiso failed to finish the work for Milestone II as promised and hired another subcontractor, Bel Air, to finish the necessary fiber network construction. Subsequently, MdBC billed against the PAX project for the same work previously represented as complete by Mr. Dialoiso's company, except, this time, MdBC represented that Bel Air completed the necessary construction.

131.     Accordingly, from July 2014 to August 9, 2014, Bel Air submitted several invoices to MdBC for the work that was supposedly completed, including "Hand Boxes," and "Conduit" construction.



 Bel Air Underground Services, Inc.
P.O. Box 496
Joppa, MD 21085

# Invoice

| Date | Invoice # |
|------|-----------|
| 7/30/2014 | 1532 |

Bill To:

Maryland Broadband Cooperative
212 West Main Street, Suite 307
Salisbury, MD 21801

| P.O. No. | Terms | Project |
|----------|-------|---------|
| Verbal | Due on receipt | MDBC-1401 Taylors Island |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | Material - Provide Conduit and Hand Boxes as required to complete this project | 115,000.00 | 115,000.00 |



Bel Air Underground Services, Inc.

P.O. Box 496
Joppa, MD 21085

| Date | Invoice # |
|------|-----------|
| 8/9/2014 | 1536 |

Bill To:

Maryland Broadband Cooperative
212 West Main Street, Suite 307
Salisbury, MD 21801

| | P.O. No. | Terms | Project | |
|---|----------|-------|---------|---|
| | Verbal | Net 30 | MDB-1401 Taylors Island | |

| Quantity | Description | U/M | Rate | Amount |
|----------|-------------|-----|------|--------|
| 1 | Material - Provide Fiber, Conduit, Hand Boxes and Misc Material to complete the project. | | 422,445.00 | 422,445.00 |

36



Bel Air Underground Services, Inc.

P.O. Box 496
Joppa, MD 21085

Invoice

| Date | Invoice # |
|------|-----------|
| 8/9/2014 | 1537 |

Bill To:

Maryland Broadband Cooperative
212 West Main Street, Suite 307
Salisbury, MD 21801

| P.O. No. | | Terms | Project |
|----------|--|-------|---------|
| | Verbal | Net 30 | MDB-1401 Taylors Island |

| Quantity | Description | U/M | Rate | Amount |
|----------|-------------|-----|------|--------|
| 1 | Place 3 way 1.25" HDPE and Hand Boxes | | 71,383.00 | 71,383.00 |



Bel Air Underground Services, Inc.

P.O. Box 496
Joppa, MD 21085

Invoice

| Date | Invoice # |
| --- | --- |
| 8/9/2014 | 1537A |

Bill To:

Maryland Broadband Cooperative
212 West Main Street, Suite 307
Salisbury, MD 21801

| P.O. No. | Terms | Project | | |
| --- | --- | --- | --- | --- |
| Verbal | Net 30 | MDB-1401 Taylors Island | | |

| Quantity | Description | U/M | Rate | Amount |
| --- | --- | --- | --- | --- |
| 1 | Place 3 way 1.25" HDPE and Hand Boxes | | 250,000.00 | 250,000.00 |

132.   The corresponding billing statements that MdBC submitted to the government are also provided below:



**Bill**

| | | | |
|---|---|---|---|
| VENDOR | Bel Air Underground Services, Inc | DATE | 07/30/2014 |
| ADDRESS | Bel Air Underground Services, Inc | REF NO | |
| | P.O Box 496 | AMOUNT DUE | 135,000.00 |
| | Joppa, MD 21085   ✓ PAID | BILL DUE | 08/09/2014 |
| TERMS | | | |
| MEMO | 1533 | | |

Expenses $135,000.00   Items   $0.00

| 510000 | Construction contractor expense 512000 | Outside | 135.0 | Work for Taylor's Island Build | Naval Air Warfare | ☐ Non grant |



**Bill**

| | | | |
|---|---|---|---|
| VENDOR | Bel Air Underground Services, Inc | DATE | 07/30/2014 |
| ADDRESS | Bel Air Underground Services, Inc | REF NO | |
| | P.O Box 496 | AMOUNT DUE | 115,000.00 |
| | Joppa, MD 21085   ✓ PAID | BILL DUE | 08/09/2014 |
| TERMS | | | |
| MEMO | 1532 | | |

Expenses $115,000.00   Items   $0.00

| 510000 | Construction contractor expense 512000 | Outside | 115,00 | Material for Taylors Island Build | Naval Air Warfare | ☐ Non grant |



**Bill**

| | | | |
|---|---|---|---|
| VENDOR | Bel Air Underground Services, Inc | DATE | 08/12/2014 |
| ADDRESS | Bel Air Underground Services, Inc | REF NO | |
| | P.O Box 496 | AMOUNT DUE | 422,445.00 |
| | Joppa, MD 21085   ✓ PAID | BILL DUE | 09/12/2014 |
| TERMS | | | |
| MEMO | | | |

Expenses $422,445.00   Items   $0.00

| 510000 | Construction contractor expense 512000 | Outside | 422.4 | Material - Provide fiber, conduit, hand boxes and Misc material to complete Taylors Island project | Naval Air Warfare | ☑ Non grant |





133. Despite billing the government for hiring two subcontractors for the same project, the Milestone II project remained unfinished. Had the government known that MdBC failed to complete the phases required for Milestone II, they would not have paid MdBC any grant funds.

134. On May 9, 2017, Relator visited the site where Milestone II was located and where MdBC represented to the government as complete in August 2016.

135. To Relator's disbelief, there was no fiber cable on the site.

136. Relator took several photos to show the missing fiber cable. The photo below is a handhole showing four conduits (pipes) that are used to carry the fiber cable. Had the fiber been

properly installed, the photo would show the fiber cable exiting the conduit on one side of the handhole where it is then, coiled into several hundred feet in the bottom of the handhole.

137.    In other words, there would be a black, coiled-up fiber cable, between the pipes, lying at the bottom of the handhole, had the fiber cable been installed.



138.    MdBC had billed the Navy for work that was obviously not completed. Neither Mr. Dialoiso nor Bel Air performed the work that MdBC charged against the PAX project. However, the Navy continued to pay MdBC reimbursements based on misrepresented progress bills submitted by MdBC.

*(b) Maryland State Highway Administration 404 Relocation Project*

139. MdBC's fraud did not only involve federal funds, but also state and local funds. As is the case with federal grants, clear and recognized intent and financial motive by MdBC and Mr. Mitchell to tamper with state grant funds are evident here.

140. For example, MdBC had a contract with the Maryland State Highway Administration. Similar to the type of false billings that had been prevalent with the federal grants, MdBC also billed the State for incomplete projects.

141. In 2016, under the contract with the Maryland State Highway Administration, MdBC represented to the State that it hired A+ Lawn & Landscaping to work on the "404 Relocation Project." After representing that A+ Lawn & Landscaping finished the requisite work for the project, MdBC billed $6,000 against the State.

142.    In addition, by representing that MdBC paid A+ Lawn & Landscaping $6,000, MdBC also falsely claimed that it was entitled to the reimbursement payment from the State.



143.    Despite the invoice statements and billing transactions, during a conversation with Mr. Rickards (owner of A+ Lawn & Landscaping) in 2017, the Relator learned that A+ Lawn had not previously provided these services for the 404 Relocation Project in 2016.

144.    In fact, A+ Lawn never even billed MdBC an amount totaling $6,000 for any services associated with the 404 Relocation Project.

145.    However, MdBC represented as such to the State so that MdBC could receive the state grant funds and pocket the money without making a single payment to A+ Lawn.

146.    MdBC continued to bill various state grant projects for unfinished milestone projects and charged for costs that never incurred.

### C. *Defendants Engaged in Bid-Rigging, Bribery, and Paying and Accepting Kickbacks to Conceal Fraud*

147.    Contractors can also defraud the government by secretly colluding with other contractors to fix prices on subcontracts, thereby corrupting the contracting process and preventing the government from obtaining competitive prices.

148.    As with contracts obtained through bribery and kickbacks, the bid-rigging scheme can also render the resulting contract invalid, and every invoice submitted under the contract is a violation of the False Claims Act.

149.    Based on the types of services needed for each federal and/or state grant project, MdBC entered into contracts with subcontractors subject to bid rigging and kickbacks. In other words, MdBC arranged ahead of time to fix contract prices with subcontractors to overcharge the government and to exhaust grant funds.

150.    First, MdBC predominantly allocated most of the subcontracting business to Bel Air and Pro Comm, solely because Mr. Mitchell had a close relationship with the owner of the companies, Mr. Kacher.

151.    Mr. Kacher was Mr. Mitchell's longtime friend and closest contact in the industry and he was privy to how Mr. Mitchell operated MdBC and its involvement with misappropriating grant funds. Thus, it was very important for Mr. Mitchell to keep his closest contact secure and ensure that Mr. Kacher's companies also financially benefitted from the grant monies.

152.    On multiple occasions, Relator observed Mr. Mitchell handpick Bel Air and Pro Comm for subcontracting jobs, even though Relator knew that neither Bel Air nor Pro Comm had expertise in the type of construction that was necessary for a certain grant project.

153. Despite receiving bids from several different companies that were more than qualified to do the necessary grant work (perhaps, some more qualified than both Bel Air and Pro Comm), Mr. Mitchell automatically delegated a majority of the services to Bel Air and Pro Comm because of his personal ties to Mr. Kacher.

154. Nevertheless, MdBC represented that Bel Air and Pro Comm completed the work, and billed the government. Had the government known MdBC's motive and intent for bid-rigging and subcontracting with Bel Air and Pro Comm, the government would not have reimbursed MdBC for the subcontracts.

155. Moreover, MdBC often paid Bel Air (and Pro Comm) large lump sums for services not rendered. Such payments were actually kickbacks paid to Bel Air and Pro Comm so that Mr. Mitchell could continue to confide in Mr. Kacher for his various wrongdoings.

156. For example, on December 7, 2016, Bel Air billed for two invoice payments ($600,000 and $100,000) to MdBC, neither of which amounted to the work purportedly completed for the PAX project.

157. The first snapshot is the invoice Bel Air billed to MdBC on December 7, 2016, for "Directional Drilling – Taylor's Island approach bore," which appears to refer to Phase IV, Milestone III – Chesapeake Bay Crossing Taylors Island to Cove Point.



| | | Invoice |
|---|---|---|

Bel Air Underground Services, Inc.
P.O. Box 496
Joppa, MD 21085

| Date | Invoice # |
|---|---|
| 12/7/2016 | 2065 |

Bill To:

Maryland Broadband Cooperative
2129A Northwood Drive
Salisbury, MD 21801

| P.O. No. | Terms | Project |
|---|---|---|
| Contract | Net 30 | MDB-1613 Bay Approach Bores (MD) |

| Item | Description | Rate | Curr % | Amount |
|---|---|---|---|---|
| Directional Drilling | Directional Drilling - Taylors Island approach bore | 600,000.00 | | 600,000.00 |

158.     Although MdBC paid Bel Air $600,000 for the PAX project, Relator discovered

that Bel Air had not actually pulled the specific cable required for Taylor's Island.

159.     Subsequently, MdBC billed the Navy for $600,000, which was the amount that

MdBC paid to Bel Air, supposedly for the PAX project. Furthermore, in this particular invoice,

the "Memo" section is empty and the billing statement does not specify what the services were for

but simply notes the bill as "Construction Contractor Expense."



160.    A similar transaction is indicated in another invoice and billing statement.

161.    The first snapshot is the invoice Bel Air billed to MdBC on December 7, 2016, for "Directional Drilling – Taylors Island approach bore," which also refers to Phase IV, Milestone III – Chesapeake Bay Crossing Taylors Island to Cove Point.



Bel Air Underground Services, Inc.
P.O. Box 496
Joppa, MD 21085

**Invoice**

| Date | Invoice # |
|---|---|
| 12/7/2016 | 2066 |

Bill To:

Maryland Broadband Cooperative
2129A Northwood Drive
Salisbury, MD 21801

| P.O. No. | | Terms | Project | | |
|---|---|---|---|---|---|
| | Contract | Net 30 | MDB-1613 Bay Approach Bores (MD) | | |

| Item | Description | Rate | Curr % | Amount |
|---|---|---|---|---|
| Directional Drilling | Directional Drilling - Taylors Island approach bore | 100,000.00 | | 100,000.00 |

162.     Although MdBC paid Bel Air another $100,000 for the PAX project, Bel Air had not done any work for completion.

163.     Subsequently, MdBC billed the Navy for $100,000, which was the amount that it had paid to Bel Air. The "Memo" section is also empty in this invoice and the billing statement does not specify what the services were for but notes the bill as "Construction Contractor Expense."



164.    These are a few examples of questionable payments made to Bel Air at the expense of government funds for fiber network services not rendered. The Relator obtained additional invoices and billing statements that show questionable payments made to Pro Comm for projects represented to the government as complete, but were unfinished. The payments to Bel Air and Pro Comm were kickback payments from MdBC made to Mr. Kacher, predominantly to sustain Mr. Mitchell's sham relationship with Mr. Kacher and his companies.

165.    After paying Bel Air and/or Pro Comm for incomplete fiber network services, MdBC eventually hired a second company to work on the construction for the project, billing the government twice for the same project.

166.    Notably, MdBC always paid Mr. Kacher an even number lump sum, *i.e.* $600,000; $100,000; etc. The Relator considered it odd, knowing that the estimated costs for reimbursements were rarely round numbers. It was as if Mr. Mitchell already had a fixed amount in mind for paying Mr. Kacher, regardless of the type of services needed for a grant project.

167.    Mr. Mitchell always personally hand-delivered lump sum payments to Mr. Kacher. Mr. Mitchell never mailed payments to Mr. Kacher.

168. In addition to payments, Mr. Mitchell provided Mr. Kacher with high-end construction equipment, brand-new trucks and boats, all of which were billed to grant projects.

169. In sum, the subcontractor bid-rigging scheme that MdBC pursued tainted the payments for Bel Air and Pro Comm, all of which MdBC billed against various grant projects. In addition, MdBC consistently made unexplained and unjustified monetary payments to Mr. Kacher in the form of kickbacks, violating the False Claims Act.

### D. *MdBC's Knowledge of Pat Mitchell's Spending Habits*

170. Mr. Mitchell's spending habits (at the expense of the government) were well-known among MdBC management and the Board of Directors. In fact, the Relator quickly discovered that Mr. Mitchell spent significant sums on meals, travel, and various recreational events, equipment and vehicles.

171. Mr. Mitchell used the company credit card for everything, including paying for docking his personal boat, which cost $3,500 to $5,000 per month. In fact, he expressed to the Relator on several occasions that MdBC was his company and that he was entitled to spend the company's money in any way that he wanted.

172. When the Relator questioned the expenses, Mr. Mitchell explained to the Relator that "he had a huge marketing budget." He told the Relator that MdBC paid for everything, including boarding his pet when Mr. Mitchell traveled, entertaining friends, many of whom had no association with the grant projects, and daily expenses, such as groceries, beer, and cigarettes.

173. Mr. Mitchell classified extravagant personal expenses, lavish fishing trips and international travels, costly boat dock fees and kickback payments to subcontractors as MdBC marketing expenses.

174.    MdBC management and the Board of Directors knew about the various fraud facilitated by Mr. Mitchell, especially concerning the large amount of expenses written off as grant project fiber optic services, but no one stopped Mr. Mitchell from operating MdBC in a way that defrauded millions of dollars from the government.

175.    As evidenced in the representative examples above, MdBC constantly billed against federal and state grant projects for Mr. Mitchell's personal expenses and MdBC's unnecessary business expenses, in order to operate the organization improperly and financially benefit from the revenue.

176.    In fact, Mr. Mitchell instructed Michelle Smethurst, CFO of MdBC to mark almost all expenses, especially those that had potential for the government to question, as "marketing" or "admin."

177.    Below is a snapshot of a spreadsheet created by the Relator to capture Mr. Mitchell's outrageous spending extravaganza from September 2006 to December 2016, all of which the MdBC grant funds paid.

| Pat CC | Visa | Fat Boys. Bills Seafood | 602141 · mktg meals | Marketing | 545.62 |
| Pat CC | Visa | board meals; Board meeting for August | 635110 · Board meetings/meals | Administrative | 2,360.33 |
| Pat CC | Visa | Board travel - MACO | 602136 · Board Travel - Special events | Marketing | 3,562.29 |
| Pat CC | Visa | Pat's Room - MACO | 602135 · Meals & Travel - Special events | Marketing | 1,661.95 |
| | | | | | |
| Pat's CC | Visa | Meals | 635130 · Meal | Administrative | 120.25 |
| Pat's CC | Visa | Bd Meals | 635110 · Board meetings/meals | Administrative | 58.61 |
| Pat's CC | Visa | Misc. Fishing Trip; boonies; romanos | 602141 · mktg meals | Marketing | 251.70 |
| Pat's CC | Visa | Nascar Race- Per Pat a Members went | 602130 · Special Events | Marketing | 2,408.00 |

### E.    *Retaliation Against Relator and Wrongful Termination*

178.    Mr. Mitchell's era at MdBC came to a halt when the FBI began to investigate MdBC for allegedly misappropriating federal and state funds.  As a result, MdBC terminated Mr. Mitchell in January 2019 and appointed Drew Van Dopp as the Acting President and CEO.

179.    In the midst of the investigation, suspicions arose and the MdBC management and the Board of Directors immediately pegged the Relator as "the mole," given his background in law enforcement and his close relationship with Mr. Mitchell.

180.    Upon taking over Mr. Mitchell's position, Mr. Van Dopp immediately took away the Relator's company vehicle, which Mr. Mitchell initially had provided to the Relator as part of his compensation package. He also refused the Relator activities that he had pursued while working under Mr. Mitchell's management. For example, the Relator had led a support group for first responders and spearheaded other civil activities in law enforcement. Those meetings often took place at the MdBC headquarters and Mr. Mitchell had always allowed the Relator to do so. However, once the FBI investigation began, Mr. Van Dopp refused to let the Relator conduct the meetings at MdBC, because according to Mr. Van Dopp, MdBC "did not need any more cops around."

181.    The hostile work environment triggered the Relator's anxiety and escalated it to alarming levels, taking a massive toll on his physical and mental health.

182.    After several months of similar retaliatory treatment from Mr. Van Dopp and other higher ups at MdBC, on March 29, 2019, the Relator voluntarily disclosed in a letter to MdBC and the Board of Directors, that he had been assisting the FBI with their investigation for about 18 months, concerning MdBC's fraudulent involvement with federal and state grant funds.

183. As the Relator had feared, three months later, on June 21, 2019, MdBC discharged the Relator. Mr. Van Dopp claimed implausibly in the termination letter that MdBC purportedly eliminated Relator's position as part of a restructuring initiative within MdBC.

184. The Relator had not experienced any hostile working conditions until the FBI started to investigate MdBC. Moreover, there had never been any indication that Relator's employment was in jeopardy until the Relator disclosed to MdBC his cooperation with the FBI's investigation about the misuse and theft of grant funds at MdBC. Given the chain of events, it is clear MdBC's termination of the Relator's employment was retribution for his protected activity.

## COUNT 1
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)
### (All Defendants)

185. Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

186. This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

187. The Federal False Claims Act, 31 U.S.C.§ 3729(a)(l)(A), provides that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ... is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, ... plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

188.    Defendants MdBC and Mr. Mitchell, knowingly presented or caused to be presented false or fraudulent claims for payment or approval of services for payment, made in connection with the subsequent misuse of broadband infrastructure grant funds paid to MdBC.

189.    Specifically, Defendants knowingly and intentionally facilitated the fraud by embezzling grant funds for unauthorized expenses and improperly charging personal expenses and business expenses against federal and state grant projects.

190.    In addition, Defendants charged the government for incomplete projects and costs that did not incur, and subsequently submitted false or fraudulent claims for reimbursement payments.

191.    Moreover, Defendants also conspired with Defendants Mr. Kacher, Bel Air, and Pro Comm to engage in bid rigging and to pay and receive kickbacks using funds associated with the grants, in order to conceal the fraud and facilitate the fraud within the inner circle.

192.    Defendants MdBC and Mr. Mitchell acted to implement their schemes associated with bid-rigging and kickbacks, by allocating most of the subcontracting business to Defendants Mr. Kacher, Bel Air, and Pro Comm, and paying them money for fiber network services that were not rendered.

193.    For those claims that MdBC caused to be submitted, it was foreseeable, and in fact, the intended result, that those claims would be submitted. Further, at all times relevant to this herein, Defendants acted with the requisite scienter.

194.    The United States was unaware of the fraud and fraudulent schemes detailed herein and but for this disclosure, would not have discovered the fraud, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

195.    Despite the Relator's efforts to address the matters related to misappropriating grant funds, MdBC failed to take proper corrective action. As a result, the government agencies relied on false invoice statements and billing for reimbursement provided by MdBC to complete broadband projects.

196.    Defendants knowingly and intentionally bypassed rules and regulations in order to secure a steady stream of revenue at the expense of grant projects.

197.    Had the government known the nature and extent of MdBC and Mr. Mitchell's intention to perpetrate fraudulent schemes, no grant payments would have been made to MdBC.

198.    As a result of these false or fraudulent claims caused to be submitted by Defendants, the United States Treasury, through payments of these claims, has suffered damage in an amount to be determined at trial, believed to be millions of dollars, plus a civil penalty for each such false claim presented or caused to be presented by Defendants.

### COUNT 2
### False Claims Act
### 31 U.S.C. § 3729(a)(l)(B)
### (All Defendants)

199.    Relator realleges and incorporates by reference each of the allegations preceding paragraphs as though fully set forth below.

200.    This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

201.    The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(B) provides that any person who:

    (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim ... is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, ... plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

202.     Defendants MdBC and Mr. Mitchell knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the United States Government through the entities administering government funds

203.     Specifically, Defendants knowingly and intentionally facilitated the fraud by embezzling grant funds for unauthorized expenses and improperly charging personal expenses and business expenses against federal and state grant projects.

204.     In addition, Defendants charged the government for incomplete projects and costs that did not incur, and subsequently submitted false or fraudulent claims for reimbursement payments.

205.     In order to facilitate the fraud, Defendants falsified and fabricated invoices and billing statements, as well as other pertinent documentation submitted for reimbursement.

206.     Moreover, Defendants also conspired with Defendants Mr. Kacher, Bel Air, and Pro Comm to engage in bid rigging and to pay and receive kickbacks using funds associated with the grants, in order to conceal the fraud and facilitate the fraud within the inner circle.

207.     Defendants MdBC and Mr. Mitchell acted to implement their schemes associated with bid-rigging and kickbacks, by allocating most of the subcontracting business to Defendants Mr. Kacher, Bel Air, and Pro Comm, and paying them money for fiber network services that were not rendered.

208. Those records and statements that MdBC caused to be submitted were submitted for the foreseeable, and in fact, the intended result, that those claims would be submitted. Further, at all times relevant to this herein, Defendants acted with the requisite scienter.

209. Relying on the false and fraudulent records presented or caused to be presented by the Defendants, the United States authorized progress payments for grant projects awarded to MdBC, which greatly enriched the Defendants but damaged the United States Government.

210. The United States was unaware of the fraud and fraudulent schemes detailed herein and, but for this disclosure, would not have discovered the fraud, the mechanisms being used to perpetrate and mask the fraud, and the true breadth and scope of the fraud.

211. Despite the Relator's efforts to address the matters related to misappropriating grant funds, MdBC failed to take proper corrective action. As a result, the government agencies relied on false invoice statements and billing for reimbursement provided by MdBC to complete broadband projects.

212. Defendants knowingly and intentionally bypassed rules and regulations in order to secure a steady stream of revenue at the expense of grant projects.

213. Had the government known the nature and extent of MdBC and Mr. Mitchell's intention to perpetrate fraudulent schemes, no grant payments would have been made to MdBC.

214. As a result of Defendants' fraudulent course of conduct, with actual knowledge of falsity and/or in deliberate ignorance or reckless disregard that such records, statements, and representations were false, Defendants made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to the government for payments to Defendants and suffered damages. The United States Government is entitled to full recovery of the amount paid by the government for the false or fraudulent records or statements submitted by Defendants.

215.  As stated in the preceding paragraphs be submitted by Defendants, the United States Treasury, through payments of these claims, has suffered damage in an amount to be determined at trial, believed to be millions of dollars, plus a civil penalty for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT 3
### FALSE CLAIMS ACT
### (31 U.S.C. § 3729(a)(1)(C))
### (All Defendants)

216.  Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

217.  This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

218.  The Federal False Claims Act, 31 U.S.C. § 3729(a)(l)(C) provides that any person who:

> (a)(1)(C) conspires to commit a violation of [false claims 31 U.S.C. § 3729(a)(1)(A); false statements 31 U.S.C. § 3729(a)(1)(B); and 31 U.S.C. § 3729(a)(1)(G)] … is liable to the United States Government for any civil penalty of not less than $5,500 and not more than $11,000 [occurred after September 29, 1999 but before November 2, 2015, and no less than $10,957 and not more than $21,916] for each violation of the FCA, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

219.  MdBC, Mr. Mitchell, Mr. Kacher, Bel Air and Pro Comm, worked in concert, conspiring with one another to participate in a fraudulent scheme to defraud the government, in connection with the subsequent misuse of broadband infrastructure grant funds paid to MdBC.

220. MdBC and Mr. Mitchell engaged in bid rigging with Mr. Kacher, Bel Air, and Pro Comm, as well as paying and accepting kickbacks using funds associated with the grant, in order to conceal the fraud and facilitate the fraud within the inner circle.

221. Defendants MdBC and Mr. Mitchell acted to implement their schemes associated with bid-rigging and kickbacks, by allocating most of the subcontracting business to Defendants Mr. Kacher, Bel Air, and Pro Comm, and paying them money for fiber network services that were not rendered.

222. As described herein, MdBC and Mr. Mitchell's systemic conduct, working in concert with the Mr. Kacher, Bel Air, and Pro Comm, includes a variety of collective efforts to ensure that the government paid MdBC based on misrepresentations, causing the submission of false or fraudulent claims and causing the government to pay for claims inundated with false reports and statements.

223. Despite the Relator's efforts to address the matters related to misappropriating grant funds, MdBC failed to take proper corrective action. As a result, the government agencies relied on false invoice statements and billing for reimbursement provided by MdBC to complete broadband projects.

224. Defendants knowingly and intentionally bypassed rules and regulations in order to secure a steady stream of revenue at the expense of grant projects.

225. Had the government known the nature and extent of MdBC and Mr. Mitchell's intention to conspire with other Defendants to perpetrate fraudulent schemes, no grant payments would have been made to MdBC.

226. The United States Government was damaged and is entitled to full recovery of the amount paid for MdBC grant projects as a result of the Defendants' fraudulent conspiracies.

227. As set forth in the preceding paragraphs in this Complaint, all of the Defendants, knowingly violated 31 U.S.C. § 3729(a)(1)(C) and damaged the United States by their action in an amount to be determined at trial and believed to be many millions of dollars.

## COUNT 4
## FALSE CLAIMS ACT
### (31 U.S.C. § 3730 (h)(1))
**(Defendants Maryland Broadband Cooperative and W. Patrick Mitchell)**

228. Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

229. This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the False Claims Act, 31 U.S.C. §§ 3729-3733, as amended, Pub. L. 99-562, 100 Stat. 3153 (1986) (the "FCA"), arising from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733 *et seq.*

230. The Federal False Claims Act, 31 U.S.C.§ 3730(h)(1) provides that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

32 U.S.C. § 3730(h)(1).

231. The Relator engaged in protected activity by assisting the FBI with their investigation concerning MdBC's fraudulent involvement with federal and state grant funds.

232. Once the FBI begin to investigate MdBC for allegedly misappropriating federal and state funds, MdBC terminated Mr. Mitchell in January 2019 and appointed Drew Van Dopp as the Acting President and CEO.

233. In the midst of the investigation, suspicions arose and the MdBC management and the Board of Directors immediately pegged the Relator as "the mole," given his background in law enforcement and his close relationship with Mr. Mitchell.

234. In fact, upon taking over Mr. Mitchell's position, Mr. Van Dopp, suspecting that the Relator was involved in the FBI investigations, immediately took away the Relator's company vehicle, which Mr. Mitchell initially had provided to the Relator. He also refused the Relator activities that he had pursued while working under Mr. Mitchell's management. For example, the Relator had led a support group for first responders and spearheaded other civil activities in law enforcement. Those meetings often took place at the MdBC headquarters and Mr. Mitchell had always allowed the Relator to do so. However, once the FBI investigation began, Mr. Van Dopp refused to let the Relator conduct the meetings at MdBC, because according to Mr. Van Dopp, MdBC "did not need any more cops around."

235. The hostile work environment triggered the Relator's anxiety and escalated it to alarming levels, taking a massive toll on his physical and mental health.

236. After several months of similar retaliatory treatment from Mr. Van Dopp and other higher ups at MdBC, on March 29, 2019, the Relator voluntarily disclosed in a letter to MdBC and the Board of Directors, that he had been assisting the FBI with their investigation.

237. As the Relator had feared, three months later, on June 21, 2019, MdBC discharged the Relator. Mr. Van Dopp claimed implausibly in the termination letter that MdBC purportedly eliminated Relator's position as part of a restructuring initiative within MdBC, which was simply not true.

238. There had never been any indication that Relator's employment was in jeopardy until the Relator disclosed to MdBC his cooperation with the FBI's investigation about the misuse

and theft of grant funds at MdBC. Furthermore, the Relator had not experienced any hostile working conditions until the FBI started to investigate MdBC.

239. Given the chain of events, it is clear MdBC's termination of the Relator's employment was retribution for his protected activity.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator Krah Plunkert prays for judgment against all of the Defendants as to Counts 1-4, and for the Court to:

(a) award the United States treble damages sustained by it for each of the false claims;

(b) award the United States the maximum civil penalty allowed for each of the false claims;

(c) award Relator 30% of the proceeds of this action or the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act, and any alternate remedy or the settlement of any such claims;

(d) award Relator all allowable damages, interest, fees and costs resulting from Defendants' retaliation;

(e) award Relator his litigation costs, expenses and reasonable attorney's fees; and

(f) grant such other relief as the Court may deem just and proper.

## COUNT 5
## MARYLAND FALSE CLAIMS ACT
### (All Defendants)

240. Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

241. This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the Maryland False Claims Act.

242. Under the Maryland False Claims Act, a person may not: (1) knowingly present or cause to be presented a false or fraudulent claim for payment or approval; (2) knowingly make,

use, or cause to be made or used a false record or statement material to a false or fraudulent claim; (3) conspire to commit a violation under this title; (4) have possession, custody, or control of money or other property used or to be used by or on behalf of a governmental entity and knowingly deliver or cause to be delivered to the government entity less than all of that money or other property.

243.    MdBC, Mr. Mitchell, Mr. Kacher, Bel Air and Pro Comm, worked in concert, conspiring with one another to participate in a fraudulent scheme to defraud the government, in connection with the subsequent misuse of broadband infrastructure grant funds paid to MdBC.

244.    MdBC and Mr. Mitchell engaged in bid rigging with Mr. Kacher, Bel Air, and Pro Comm, as well as paying and accepting kickbacks using funds associated with the grant, in order to conceal the fraud and facilitate the fraud within the inner circle.

245.    Defendants MdBC and Mr. Mitchell acted to implement their schemes associated with bid-rigging and kickbacks, by allocating most of the subcontracting business to Defendants Mr. Kacher, Bel Air, and Pro Comm, and paying them money for fiber network services that were not rendered.

246.    As described herein, MdBC and Mr. Mitchell's systemic conduct, working in concert with the Mr. Kacher, Bel Air, and Pro Comm, includes a variety of collective efforts to ensure that the government paid MdBC based on misrepresentations, causing the submission of false or fraudulent claims and causing the government to pay for claims inundated with false reports and statements.

247.    Despite the Relator's efforts to address the matters related to misappropriating grant funds, MdBC failed to take proper corrective action. As a result, the government agencies relied

on false invoice statements and billing for reimbursement provided by MdBC to complete state broadband projects.

248.     Defendants knowingly and intentionally bypassed rules and regulations in order to secure a steady stream of revenue at the expense of grant projects.

249.     Had the government known the nature and extent of MdBC and Mr. Mitchell's intention to conspire with other Defendants to perpetrate fraudulent schemes, no grant payments would have been made to MdBC.

250.     The United States Government was damaged and is entitled to full recovery of the amount paid for MdBC grant projects as a result of the Defendants fraudulent conspiracies.

251.     As set forth in the preceding paragraphs in this Complaint, all of the Defendants, knowingly violated the Maryland False Claims Act and damaged the United States by their action in an amount to be determined at trial and believed to be many millions of dollars.

### COUNT 6
### MARYLAND FALSE CLAIMS ACT
### (Defendants Maryland Broadband Cooperative and W. Patrick Mitchell)

252.     Relator reallege and incorporate by reference each of the allegations in the preceding paragraphs as though fully set forth below.

253.     This is a claim brought by Relator and the United States to recover treble damages, civil penalties and the fees and cost of this action, under the Maryland False Claims Act.

254.     Under the Maryland False Claims Act, a person may not take retaliatory action against an employee, a contractor, or a grantee because the employee, contractor, or grantee:

> (1) acts lawfully in furtherance of an action filed under this title, including an investigation for, initiation of, testimony for, or assistance in an action filed under this title;
>
> (2) discloses or threatens to disclose to supervisor or to a public body an activity, a policy, or a practice of the person that the employee, contractor, or grantee

reasonably believes is in violation of § 8-102 of this title or a regulation adopted under this title;

(3) provides information to, or testifies before, a public body conducting an investigation, a hearing, or an inquiry into a violation of § 8-102 of this title or a regulation adopted under this title that is allegedly or actually committed by the person; or

(4) objects to or refuses to participate in any activity, policy, or practice that the employee, contractor, or grantee reasonably believes is in violation of § 8-102 of this title or a regulation adopted under this title.

[...]

Md. Code Ann., Gen Provis. § 8-107.

255.    The Relator engaged in protected activity by assisting the FBI with their investigation concerning MdBC's fraudulent involvement with state grant funds.

256.    Once the FBI begin to investigate MdBC for allegedly misappropriating state funds, MdBC terminated Mr. Mitchell in January 2019 and appointed Drew Van Dopp as the Acting President and CEO.

257.    In the midst of the investigation, suspicions arose and the MdBC management and the Board of Directors immediately pegged the Relator as "the mole," given his background in law enforcement and his close relationship with Mr. Mitchell.

258.    In fact, upon taking over Mr. Mitchell's position, Mr. Van Dopp, suspecting that the Relator was involved in the FBI investigations, immediately took away the Relator's company vehicle, which Mr. Mitchell initially had provided to the Relator. He also refused the Relator activities that he had pursued while working under Mr. Mitchell's management. For example, the Relator had led a support group for first responders and spearheaded other civil activities in law enforcement. Those meetings often took place at the MdBC headquarters and Mr. Mitchell had always allowed the Relator to do so. However, once the FBI investigation began, Mr. Van Dopp

refused to let the Relator conduct the meetings at MdBC, because according to Mr. Van Dopp, MdBC "did not need any more cops around."

259.     The hostile work environment triggered the Relator's anxiety and escalated it to alarming levels, taking a massive toll on his physical and mental health.

260.     After several months of similar retaliatory treatment from Mr. Van Dopp and other higher ups at MdBC, on March 29, 2019, the Relator voluntarily disclosed in a letter to MdBC and the Board of Directors, that he had been assisting the FBI with their investigation.

261.     As the Relator had feared, three months later, on June 21, 2019, MdBC discharged the Relator. Mr. Van Dopp claimed implausibly in the termination letter that MdBC purportedly eliminated Relator's position as part of a restructuring initiative within MdBC, which was simply not true.

262.     There had never been any indication that Relator's employment was in jeopardy until the Relator disclosed to MdBC his cooperation with the FBI's investigation about the misuse and theft of grant funds at MdBC. Furthermore, the Relator had not experienced any hostile working conditions until the FBI started to investigate MdBC.

263.     Given the chain of events, it is clear MdBC's termination of the Relator's employment was retribution for his protected activity.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator Krah Plunkert prays for judgment against all of the Defendants as to Counts 5 and 6, and for the Court to award:

**To the State of Maryland**

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;
(2) A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;
(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

**To Relator**

(1) The maximum amount allowed pursuant to the Maryland False Claims Act;
(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;
(3) An award of reasonable attorneys' fees and costs; and
(4) Such further relief as this Court deems equitable and just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Dated: November 25, 2019

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By: _____

Jay P. Holland (MD Bar # 06015)
jholland@jgllaw.com
Sarah Chu (MD Bar # 21046)
schu@jgllaw.com
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
Tel: (301) 220-2200
Fax: (301) 220-1214

Robin R. Cockey
rrcesq@cbmlawfirm.com
Ashley A. Bosché
bosche@cbmlawfirm.com
COCKEY, BRENNAN & MALONEY, P.C.
313 Lemmon Hill Lane
Salisbury, MD 21801
Tel: (410) 546-1750
Fax: (410) 546-1811

*Counsel for Plaintiff/Relator Krah Plunkert*
